[No. B100377. Second Dist., Div. Four. Nov. 26, 1996.]

STEPHAN FLEET, a Minor, etc., et al., Plaintiffs and Appellants, v. CBS, INC., et al., Defendants and Respondents.

## Counsel

Bigelow, Moore & Tyre, Franklin T. Bigelow, Jr., James S. Tyre and Anne Reid Oppermann for Plaintiffs and Appellants.

Davis Wright Tremaine, Kelli L. Sager and Karen N. Frederiksen for Defendants and Respondents.

## Opinion

**BARON, J.**—In this case we are asked to decide a very narrow issue: whether an actor may bring an action for misappropriation of his or her name, image, likeness, or identity under section 3344 of the Civil Code when the only alleged exploitation occurred through the distribution of the actor's performance in a motion picture. The trial court concluded that to the extent California law would permit such claim, it was preempted by federal copyright law. We agree with the trial court and affirm.

### Factual Background

The crucial facts are not disputed. In 1985, Legend Productions (Legend), a partnership comprised of Robert Fleet and his wife, Alina Szpak-Fleet (Szpak), entered into a coproduction agreement with certain Polish film entities to coproduce two motion pictures, one of which is the subject of this lawsuit. Legend, Robert Fleet, and Szpak subsequently transferred all of their right, title, and interest in the coproduction agreement to White Dragon Productions, a California corporation formed to act as the production company for the movie. Robert Fleet and Szpak were the sole shareholders of

White Dragon Productions. In July of 1985, Andrejez Krakowski and Lloyd E. Eisenhower II, acting as sales agents for White Dragon Productions, Robert Fleet, Szpak, and Legend entered into a distribution agreement with respondent CBS, Inc., which gave CBS the exclusive rights to distribute the motion picture then known as White Dragon in all media throughout the world, except in the former communist bloc countries.[1] CBS paid $1,250,000 for these rights.

The film commenced shooting on location in Poland in September 1985. Appellant Stephan Fleet is the son of Robert Fleet and Szpak. He and appellant Archie Lee Simpson appeared as actors in the film.

White Dragon Productions entered into separate agreements with one Tadeusz Bugaj to provide financing and with a company known as Performance Guarantees, Inc., to ensure that the film would be completed on time and on budget. In March of 1986, Performance Guarantees stepped in to complete the film and refused to pay the salaries owed to appellants. Litigation over the parties' rights and obligations under these agreements led to the issuance of a preliminary injunction in June of 1986 which, appellants contend, prevented them from communicating with CBS about the subject matter of the film until the injunction was dissolved in December of 1989. After the injunction was lifted, Robert Fleet wrote to CBS reasserting his and his wife's control of White Dragon Productions and asking for a copy of the film. Subsequently, in or about March of 1990, appellants informed CBS that since they had not been compensated for their appearances in the film, CBS did not have permission to utilize their names, pictures, or likenesses in conjunction with any exploitation of the film. CBS went ahead and released

---

[1] Under the terms of the distribution agreement, the "Licensor [defined as Andrejez Krakowski and Lloyd E. Eisenhower II] hereby grants to Distributor [CBS Productions] the exclusive right and license for the 'Distribution Term' . . . to exercise all rights of distribution in all media (including, without limitation, theatrical, non-theatrical, free television, pay television, cable television, and videocassette exhibition) with respect to the Picture throughout the 'Territory' . . . pursuant to the following terms and conditions." The licensors also assigned to CBS Productions "the sole, irrevocable and exclusive distribution and exploitation rights for the entire world (excluding only Poland, Czechoslovakia, USSR, Hungary, East Germany [DDR], Bulgaria, Romania, People's Republic of China, Vietnam, North Korea, Yugoslavia and Mongolia and all of their territories and possessions, military and diplomatic installations and ships and aircraft flying their flags, wherever situated) forever in perpetuity in any and all media (including without limitation the exclusive theatrical, free, cable and pay television, videodisc and videocassette rights, and soundtrack album, music publishing and merchandising rights), in and to that certain theatrical motion picture entitled WHITE DRAGON, . . . including all contents thereof, all present and future adaptations, versions and translations thereof and the theme, title and characters thereof, and in and to all copyrights thereon and renewals and extensions of copyright therein." Later the agreement was amended to delete reference to Krakowski and Eisenhower as licensors and substitute White Dragon Productions.

the film on videotape under the title "Legend of the White Horse" and, according to the complaint, included a picture of Stephan Fleet on the box.

## PROCEEDINGS IN THE TRIAL COURT

Appellants brought a complaint against CBS, two of its divisions, and CBS/Fox Video, Inc. (collectively referred to hereafter as CBS) in November of 1993. Insofar as appellants' claims are concerned,[2] the complaint alleges that CBS was notified in March of 1990 that it was not authorized to use the performances of actors Stephan Fleet or Archie Simpson; that Performance Guarantees had breached the terms of the completion bond; that CBS had breached the terms of the distribution agreement; and that "CBS was not authorized to exploit or utilize the Motion Picture in any fashion until the problems and breaches were corrected." The complaint specifically stated that the reason CBS was not authorized to utilize the name, voice, photograph, likeness or performance of appellants in the motion picture was because they were not fully paid. Stephan Fleet further alleged that CBS failed to accord him the credit to which he was contractually entitled on videotape releases of the motion picture; that CBS made unauthorized use of his photograph and likeness on the packaging and advertising materials for the motion picture; and that CBS acquiesced in the redubbing of all his speaking parts without his permission.

Based on these allegations, the complaint contended that CBS violated section 3344 of the Civil Code. Section 3344 makes it unlawful to "knowingly use[] another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent, or, in the case of a minor, the prior consent of his parent or legal guardian . . . ." The complaint also contained a claim for unfair business practices (Bus. & Prof. Code, § 17200 et seq.) based on the asserted violation of Civil Code section 3344. Appellants, along with the other plaintiffs, sought an accounting and a constructive trust.

CBS filed a cross-complaint against Robert Fleet, Szpak, Legend, White Dragon Productions, Krakowski, Eisenhower, Performance Guarantees, and Lawrence Vanger alleging that to the extent CBS did not have the right to distribute the film, it was owed indemnification under its distribution agreement or was entitled to rescind the distribution agreement and obtain refund of the moneys paid thereunder, including interest.

---

[2]Also named as plaintiffs were Robert Fleet, Szpak, Legend, White Dragon Productions, Film Polski, and Film Studio Perspektywa. Robert Fleet acted in the film and asserted claims similar to appellants', but is not a party to this appeal because other claims to which he is a party are still pending in the trial court. Robert Fleet sought relief by way of petition for writ of mandate which was summarily denied as untimely.

CBS moved for summary judgment. In its separate statement of undisputed facts, CBS set forth the following fact which went undisputed by appellants: "CBS owns the copyright in the Motion Picture pursuant to federal copyright law."[3] The court granted the motion for summary adjudication as to the causes of action for violation of Civil Code section 3344 on the ground that appellants' performances were within the scope of copyright protection in that they were "fixed in a tangible medium of expression" and further found that the rights asserted were equivalent to the exclusive rights of copyright. Thus, the court believed, appellants' claims met the two-pronged test for preemption by the federal copyright law. Because the grant of summary adjudication resolved all of the claims between appellants and CBS, they brought an appeal from the order entered.

DISCUSSION

I

Before we begin our analysis, we must emphasize that we are resolving at appellants' insistence only the very narrow issue outlined above. Appellants have repeatedly stressed that "[t]his is not a copyright infringement case" and that their claims are solely a matter of violation of Civil Code section 3344, California's "right to publicity" statute. They assert no interest in the copyright for the motion picture or in any copyright which may cover the individual performances therein.

In addition, CBS contended, and persuaded the trial court, that appellants were employees of the production company and "voluntarily relinquished any copyright in the performances and screenplay since those works constituted 'works for hire' under Section 101 and 201 [of the 1976 Copyright

---

[3]We note that, strictly speaking, this was the only fact contained in the moving party's so-called statement of undisputed facts. Every motion for summary judgment should be accompanied by a "separate statement setting forth plainly and concisely all material facts which the moving party contends are undisputed." (Code Civ. Proc., § 437c, subd. (b).) Facts stated elsewhere need not be considered by the court (*North Coast Business Park* v. *Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 31 [21 Cal.Rptr.2d 104]), and failure to comply with this rule constitutes ground for denial at the court's discretion (*Wilson* v. *Blue Cross of So. California* (1990) 222 Cal.App.3d 660, 671 [271 Cal.Rptr. 876]). Here, CBS expected the court to glean the background facts necessary to resolving its motion from the complaint, the opposing parties' admissions, a separately filed stipulation concerning the authenticity of certain documents and the dates of certain events, and the documents themselves. Because the trial court was apparently willing to do so and because the crucial facts are to be found somewhere in the record and are undisputed by appellants, we will not disturb the trial court's ruling on this ground.

Act]."[4] It is true that "[i]n the case of a work made for hire, the employer . . . for whom the work was prepared is considered the author . . . , and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." (17 U.S.C. § 201(b).) However, the United States Supreme Court held in *Community for Creative Non-Violence* v. *Reid* (1989) 490 U.S. 730, 751 [104 L.Ed.2d 811, 831-832, 109 S.Ct. 2166], that the question of whether a hired party is an employee for purposes of the 1976 Copyright Act is a question of fact resolved by consideration of the usual factors distinguishing employees from independent contractors, such as skill required, source of tools, location of work, method of payment, etc. If the hired party is an independent contractor, the work made for hire doctrine does not apply unless the work is "specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas" *and* "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." (17 U.S.C. § 101.) CBS presented no evidence to suggest that appellants were employees of White Dragon Productions or to suggest that they signed an instrument as independent contractors stating that their performances should be considered work for hire. At the same time, appellants never contested CBS's allegation that they were employees of White Dragon Productions—no doubt because they asserted no claims under copyright law. Consequently, we do not decide whether an actor who performs in a motion picture is an employee of the producer or an independent contractor and, if the latter, whether the performance otherwise falls under the definition of "work made for hire" contained in section 101 of the federal law. Instead, we turn our attention to the question of whether the rights appellants claim under California's statute can coexist with the federal copyright statute.

---

[4]Under this doctrine, employers and persons who commission a work own all of the rights comprised in the copyright as stated in 17 United States Code section 201(b) the 1976 Copyright Act, which provides: "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." Under 17 United States Code section 106, the copyright holder has the exclusive rights "(1) to reproduce the copyrighted work in copies or phonorecords; [¶] (2) to prepare derivative works based upon the copyrighted work; [¶] (3) to distribute copies of phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; [¶] (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and [¶] (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly."

## II

Under California law, an individual's right to publicity is invaded if another appropriates for his advantage the individual's name, image, identity or likeness. This is an actionable tort under both common law and Civil Code section 3344. (*Montana* v. *San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 793 [40 Cal.Rptr.2d 639]; *Eastwood* v. *Superior Court* (1983) 149 Cal.App.3d 409, 417 [198 Cal.Rptr. 342]; see Rest.3d Unfair Competition, § 46, p. 528 ["One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability . . . ."].)

"A common law cause of action for appropriation of name or likeness may be pleaded by alleging (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. [Citations.] [¶] In addition, to plead the statutory remedy provided in Civil Code section 3344, there must also be an allegation of a knowing use of the plaintiff's name, photograph or likeness for purposes of advertising or solicitation or purchases. [Citation.] Furthermore, recent judicial construction of section 3344 has imposed an additional requirement. A 'direct' connection must be alleged between the use and the commercial purpose. [Citation.]" (*Eastwood* v. *Superior Court, supra*, 149 Cal.App.3d at pp. 417-418; accord, *Montana* v. *San Jose Mercury News, Inc., supra*, 34 Cal.App.4th at p. 793.)

California law concerning right to publicity, as any state statute or law, is subject to preemption under the supremacy clause of the United States Constitution if it "actually conflicts with a valid federal statute" or " ' "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' " (*Edgar* v. *MITE Corp.* (1982) 457 U.S. 624, 631 [73 L.Ed.2d 269, 276, 102 S.Ct. 2629].) In addition, "when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. [Citation.]" (*California Federal S.& L. Assn.* v. *Guerra* (1986) 479 U.S. 272, 280 [93 L.Ed.2d 613, 623, 107 S.Ct. 683].) 17 United States Code section 301, part of the 1976 Copyright Act (hereafter referred to as the Act) expressly prohibits states from legislating in the area of copyright law. It provides: "On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is

entitled to any such right or equivalent right in any such work under the common law or statutes of any State."

Thus, for preemption to occur under the Act, two conditions must be met: first, the subject of the claim must be a work fixed in a tangible medium of expression and come within the subject matter or scope of copyright protection as described in sections 102 and 103 of 17 United States Code, and second, the right asserted under state law must be equivalent to the exclusive rights contained in section 106. (*Del Madera Properties* v. *Rhodes and Gardner, Inc.* (9th Cir. 1987) 820 F.2d 973, 976; *Trenton* v. *Infinity Broadcasting Corp.* (C.D.Cal. 1994) 865 F.Supp. 1416, 1427-1428.)

 Appellants insist that neither of these conditions is met and that their claims pose no threat to the federal scheme because a person's name, voice, likeness, and overall persona are not copyrightable and assertion of these rights cannot be equivalent to those that fall under the Act's protection. We agree that as a general proposition Civil Code section 3344 is intended to protect rights which cannot be copyrighted and that claims made under its provisions are usually not preempted. But appellants' analysis crumbles in the face of one obvious fact: their individual performances in the film White Dragon were copyrightable. Since their section 3344 claims seeks only to prevent CBS from reproducing and distributing their performances in the film, their claims must be preempted by federal copyright law.

A. *Within the Subject Matter or Scope of Copyright Protection*

Section 102 of the Act, by its express terms, protects "original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." (17 U.S.C. § 102(a).) A "work of authorship" is specifically defined to include "dramatic works[.]" (*Id.*, § 102(a)(3).) A work is fixed in tangible medium of expression "when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." (*Id.*, § 101.)

There can be no question that, once appellants' performances were put on film, they became "dramatic work[s]" "fixed in [a] tangible medium of expression" that could be "perceived, reproduced, or otherwise communicated" through "the aid of a machine or device." (17 U.S.C. § 102(a).) At

that point, the performances came within the scope or subject matter of copyright law protection.[5]

B. *Equivalent to Exclusive Rights Contained in the Act*

Appellants deny that the rights which they are asserting under Civil Code section 3344 are equivalent to the rights available under copyright law, but their denial rings hollow. Appellants seek to protect the physical images of their performances captured on film in the subject motion picture and no others. CBS seeks to display or reproduce those images and no others. The owner of a copyright—either the "author" (actor) or his employer (the producer)—is vested with the exclusive rights to, among other things, "reproduce the copyrighted work" and "display the copyrighted work publicly."[6] (17 U.S.C. § 106.) Appellants may choose to call their claims misappropriation of right to publicity, but if all they are seeking is to prevent a party from exhibiting a copyrighted work they are making a claim "equivalent to an exclusive right within the general scope of copyright."

To support their contention that their right to sue for appropriation of their name, voice, likeness, or persona survives the fixing of their performance in a tangible medium, appellants quote Professor Nimmer's treatise in which it is said that a "name and likeness does not become a work of authorship simply because it is embodied in a copyrightable work such as a photograph." (1 Nimmer on Copyright (1996) § 1.01[B][1][c], pp. 1-22 to 1-23, fn. omitted.) Again, we have no quarrel with this general proposition, but see no basis for its application here. The celebrity who has merely had his picture taken has not engaged in a "dramatic work" or other "work of authorship," and, as Professor Nimmer said, would be afforded no protection under federal copyright law. Thus, if not for state law, he would have no remedy against those who would misappropriate his image for their own gain. Here, in contrast, it was not merely appellants' likenesses which were

---

[5]The case of *Zacchini* v. *Scripps-Howard Broadcasting Co.* (1977) 433 U.S. 562 [53 L.Ed.2d 965, 97 S.Ct. 2849], relied on by appellants, does not point to a different conclusion. There, a performer sued a television station for violating his right of publicity by taping and broadcasting the entirety of his human cannonball act, and the Supreme Court upheld his right to do so. The important distinction between Zacchini's situation and appellants' *is that* Zacchini had not consented to the taping. A work is fixed in a tangible of expression for purposes of the Act, only if recorded "by or under the authority of the author." (17 U.S.C. § 101.) Here, appellants' performances in the film were recorded with their active participation and consent.

[6]Appellants asserted in their complaint that CBS wrongly used stills from the motion picture for advertising or promotional purposes. It is unclear from their brief whether appellants continue to assert this as a basis for their claims. If so, we note that section 106 specifically gives to the holder of the copyright the right to display publicly "individual images of a motion picture." (17 U.S.C. § 106.)

captured on film—it was their dramatic performances which are, as we have seen, copyrightable. An actor who wishes to protect the use of the image contained in a single, fixed dramatic performance need simply retain the copyright.

The authorities cited by appellants support our understanding. In *Eastwood* v. *Superior Court, supra,* 149 Cal.App.3d 409, defendant used a photograph of the well-known actor Clint Eastwood, along with his name and likeness, to sell their newspaper. Since neither his name nor his likeness and image as portrayed in the photograph were copyrightable, no issue of preemption arose. The same was true in *Abdul-Jabbar* v. *General Motors Corp.* (9th Cir. 1996) 85 F.3d 407, wherein defendants used the name "Lew Alcindor" in a television commercial without consent; *Cher* v. *Forum International, Ltd.* (9th Cir. 1982) 692 F.2d 634, wherein the actress/singer's photograph was used to solicit subscribers to a magazine in such a way as to convey the misimpression that she endorsed the magazine; and *Clark* v. *Celeb Publishing, Inc.* (S.D.N.Y. 1981) 530 F.Supp. 979, wherein the photograph of a model was used without her permission to solicit subscribers to a hard core pornographic magazine. Numerous other cases hold that where the defendant uses a lookalike or soundalike, the person whose voice or image is being imitated may state a claim for misappropriation of publicity rights. (See, e.g., *White* v. *Samsung Electronics America, Inc.* (9th Cir. 1992) 971 F.2d 1395; *Midler* v. *Ford Motor Company* (9th Cir. 1988) 849 F.2d 460.) The state law claims in these cases were not preempted because it was plaintiffs' image or likeness—and not his or her copyrightable dramatic or musical performance—which had been appropriated.

Appellants cite these cases for the proposition that where "the plaintiff neither owns, nor claims to own, the copyright, there is no preemption and the plaintiff is entitled to pursue his or her claim for wrongful appropriation of the rights of privacy and/or publicity even though the medium in which the offending misappropriation has occurred is itself, copyrightable or even copyrighted." Appellants misapprehend the lesson to be drawn from the cases. In each of the cited cases, the right sought to be protected was not copyrightable—Clint Eastwood's likeness captured in a photograph; Kareem Abdul-Jabbar's former name; Bette Midler's distinctive vocal style; Vanna White's distinctive visual image, etc. The plaintiffs in those cases asserted no copyright claims *because they had none to assert.* Here, by contrast, appellants seek to prevent CBS from using performances captured on film. These performances were copyrightable and appellants could have claimed a

copyright in them as have the numerous performers whom we discuss in the following section.

## III

We turn to a discussion of the Seventh Circuit's landmark decision in *Baltimore Orioles* v. *Major League Baseball Players* (7th Cir. 1986) 805 F.2d 663), because the parties devote lengthy portions of their briefs to this opinion—CBS suggesting that it is the only case we need consider and appellants pointing to its numerous critics. As we read it, the case is of limited value because the court primarily focused on two issues not present here. First, the court held that a baseball game is an original work of authorship under section 102 of the Act, although sporting events are nowhere mentioned in that provision. (805 F.2d at p. 668.) This has been the most criticized aspect of the opinion. Professor Nimmer subjected it to thorough analysis in his treatise. He agreed that "a *telecast* . . . of an athletic event . . . can qualify for copyright protection" but thought the Seventh Circuit could be faulted for failing to carefully distinguish between "the creative aspects of the motion picture [or telecast]" and "the creative aspects of the *underlying subject matter* portrayed therein," thereby misanalyzing the important question of "whether the subject activity captured on film (or videotape, etc.) can itself be the subject of copyright protection." (1 Nimmer on Copyright, *supra*, § 2.09[F], p. 2-166, italics added.) This turns on "whether it [the sporting event] is a work of authorship produced through creative input," or put another way "whether the football game itself is a copyrightable work." (*Ibid.*) Professor Nimmer clearly expressed the belief that sporting events are not creative works of authorship, and concluded, therefore, that it would be "[f]ar more reasonable" to say "that athletic events are subject to legal protection pursuant only to right of publicity, misappropriation, and other established legal doctrines outside the ambit of statutory copyright." (*Id.* at p. 2-170.1, fn. omitted.)

We agree with Professor Nimmer that to determine whether appellants' claim is preempted, the creative aspects of the motion picture as a whole must be separated from the creative aspects of the underlying subject matter (the actors' performances in the film) to determine whether the underlying subject matter is itself copyrightable. The Seventh Circuit decided that a baseball game or other sporting event was a creative work of authorship. We can well understand why that conclusion has given rise to so much controversy among the commentators and express no opinion as to its correctness. But it has no import here where the underlying subject matter consists of performances in a film. The statute defines "works of authorship" to include "dramatic works." There can be no dispute that appellants' performances

were "dramatic works" produced through creative input and meet the statutory definition of "works of authorship."

The second issue to which the court in *Baltimore Orioles* directed its focus was whether baseball players are employees of the clubs. The court held that they were, and that therefore their performances in the games were "works made for hire" owned by their employers. (805 F.2d at pp. 669-670.) As we have said, we have not been called on to decide, and do not decide, whether the actors in the film were employees or whether the works made for hire doctrine otherwise applies. Accordingly, this aspect of the decision has no relevance to the present case.

Finally, we come to the portion of the opinion which does have relevance. The court in *Baltimore Orioles* concluded that since the games were copyrightable and since the clubs owned the copyrights under the works made for hire doctrine, the players could not prevent the clubs from exploiting the works by asserting a state law claim for violation of the right to publicity. Contrary to what appellants would have us believe, there is nothing controversial about that aspect of the opinion. It follows inescapably from the Act and the conclusions that the players' performances in the baseball games were works of authorship fixed in a tangible medium of expression and that the clubs held the copyright. "By virtue of being videotaped . . . the players' performances are fixed in tangible form, and any rights of publicity in their performances that are equivalent to the rights contained in the copyright of the telecast are preempted." (805 F.2d at p. 675.)

Nor is the Seventh Circuit the only court to have come to the obvious conclusion that a party who does not hold the copyright in a performance captured on film cannot prevent the one who does from exploiting it by resort to state law. In *Brown v. Twentieth Century Fox Film Corp.* (D.D.C. 1992) 799 F.Supp. 166, James Brown (the Godfather of Soul) brought suit when a clip of his performance of the song *Please, Please, Please*, originally performed in a '60's television show appeared, without his consent, in the 1991 movie The Commitments about a fictional rock and roll band. The court first analyzed his copyright claims and concluded the producer of the television show held the rights to the performance pursuant to the parties' 1964 agreement. Brown alternatively argued that use of his name, likeness, and persona violated his "right of publicity" under a New York law similar to California's. The court concluded that "[b]ecause defendants lawfully acquired the right to use the [television] Show performance . . . the alleged violation of the right of publicity cannot be based on their use of that performance." (799 F.Supp. at p. 172.)

In *Rooney* v. *Columbia Pictures Industries, Inc.* (S.D.N.Y. 1982) 538 F.Supp. 211, actor Mickey Rooney accused several studios of wrongly refusing to deal with him regarding his "publicity rights" in pre-1960 films, and contended they had wrongfully shown the films on commercial and cable television and distributed them on videocassette. (538 F.Supp. at pp. 211-212.) The court concluded that the contracts signed by Rooney were broad enough to include transfer of rights covering television and videocassette display of his performances. Turning to the cause of action alleging misappropriation of Rooney's common law "right of publicity," the court held: "[A]ny such rights were assigned or waived by the contracts granting defendants all rights in the pre-1960 films." (*Id.* at p. 230.)

Similarly, in *Muller* v. *Walt Disney Productions* (S.D.N.Y. 1994) 871 F.Supp. 678, the court concluded that the conductor who appeared in Walt Disney's Fantasia had given up all rights in his performance, and specifically the right to prevent home video release, because the contract between the parties gave Disney control over the distribution, exploitation, and exhibition of the photoplay. Accordingly, the court dismissed plaintiff's claim under federal copyright law. At the same time, the court dismissed plaintiff's claims for common law copyright infringement, misappropriation, conversion, and unjust enrichment because they were premised on the contention that plaintiff had ownership rights in the performance. (871 F.Supp. at p. 685; see also *Trenton* v. *Infinity Broadcasting Corp.*, *supra*, 865 F.Supp. at pp. 1428-1429 [the creator and original host of a radio program could not assert state law claims for unfair competition, conversion, conspiracy, slander of title, among others, where his complaint was based on his former employer's use of the radio programs in which they held the copyright].)

Although they did not all say so expressly, we believe that all these courts would agree with the Seventh Circuit that "[b]ecause a performance is fixed in tangible form when it is recorded, a right of publicity in [such] performance . . . is subject to preemption." (*Baltimore Orioles* v. *Major League Baseball Players*, *supra*, 805 F.2d at p. 677, fn. 26.) We concur with these authorities, and also with Professor Nimmer (1 Nimmer on Copyright, *supra*, § 1.01[B][1], p. 1-14), in holding that a right is equivalent to rights within the exclusive province of copyright when it is infringed by the mere act of reproducing, performing, distributing, or displaying the work at issue. A claim asserted to prevent nothing more than the reproduction, performance, distribution, or display of a dramatic performance captured on film is subsumed by copyright law and preempted.

## DISPOSITION

For all the foregoing reasons, the judgment of the trial court is affirmed.

Vogel (C. S.), P. J., and Aranda, J.,* concurred.

---

*Judge of the Municipal Court for the South Bay Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.