[No. B127931. Second Dist., Div. One. Feb. 17, 2000.]

KNB ENTERPRISES, Plaintiff and Appellant, v.
GREG W. MATTHEWS, Defendant and Respondent.

**COUNSEL**

Jonathan P. Milberg and David L. Amkraut for Plaintiff and Appellant.

Lauren Ross for Defendant and Respondent.

**OPINION**

**ORTEGA, Acting P. J.**—In *Fleet v. CBS, Inc.* (1996) 50 Cal.App.4th 1911 [58 Cal.Rptr.2d 645], the appellate court held that unpaid film actors' claims for misappropriation of name, photograph, or likeness under section 3344 of the Civil Code[1] were preempted by federal copyright law, where the only misappropriation alleged was the film's authorized distribution by the exclusive distributor, CBS. Here, we must decide whether photography models' misappropriation claims under section 3344 are preempted by federal copyright law, where the alleged exploitation was the *un*authorized display, for profit, of the models' erotic photographs on defendant's Internet Web site featuring sexually explicit photographs.

Plaintiff KNB Enterprises owns the copyright to the photographs at issue in this case. Plaintiff concedes that any copyright infringement claim rests within the exclusive jurisdiction of the federal courts. (17 U.S.C. § 301; *Young v. J. M. Hickerson, Inc.* (1957) 9 Misc.2d 932 [170 N.Y.S.2d 168] [professional photographer's suit for common law appropriation based on the unauthorized use of her copyrighted work was held to be preempted by federal copyright law].) Rather than pursue a federal copyright infringement action, however, plaintiff seeks section 3344 damages for the commercial appropriation of the models' photographs caused by their unauthorized commercial display on defendant Greg W. Matthew's Web site, Justpics.

---

[1]All further statutory references are to the Civil Code unless otherwise indicated.

The models' section 3344 rights that plaintiff asserts in this action were obtained by contractual assignment.[2]

We conclude that because a human likeness is not copyrightable, even if captured in a copyrighted photograph, the models' section 3344 claims against the unauthorized publisher of their photographs are not the equivalent of a copyright infringement claim and are not preempted by federal copyright law. Accordingly, we reverse the summary judgment for defendant and remand for further proceedings.

BACKGROUND

For purposes of their cross-motions for summary judgment only, the parties stipulated to the following facts.

There are 417 erotic photographs at issue. The photographs depict 452 models, all of whom have assigned their section 3344 rights to plaintiff.[3] Plaintiff owns the copyright to all the photographs.

Plaintiff displays erotic photographs on its own Web site. To promote its Web site, plaintiff intermittently posts its copyrighted photographs to certain Usenet newsgroups.[4] By posting its photographs on the Usenet, plaintiff is not placing them in the public domain or permitting their unauthorized commercial use, display, or publication.

---

[2]The parties do not dispute that under California law, the right of publicity is assignable. (*Lugosi v. Universal Pictures* (1979) 25 Cal.3d 813, 820, 823 [160 Cal.Rptr. 323, 603 P.2d 425, 10 A.L.R.4th 1150], superseded by former § 990 (now § 3344.1) [creating a postmortem right of publicity in a "deceased personality's name, voice, signature, photograph or likeness"].)

[3]The contractual agreements are not included in the record on appeal.

[4]The following facts are taken from Matthews's declaration: ". . . Usenet is a public forum on the Internet where individuals can participate in the open exchange of information. This information includes, among other things, messages, recipes, software and pictures. I am informed and believe that Plaintiff KNB Enterprises operates a website on the Worldwide Web known as webvirgins, which provides erotic images for a fee. As part of plaintiff's efforts to entice people to subscribe to its webvirgins site, it uploads sample images to the Usenet. Anyone with access to the Usenet can view these sample images at no charge, and can download (put onto their own computer hard disk) those images.

". . . Usenet is one part of the Internet that provides information from over 30,000 user[ ]groups. These user[ ]groups generally provide information regarding topics of public interest. In order for a person with a computer to access this Usenet information, they must have a computer program known as a newsreader on their computer. There are a number of Internet users who do not have access to Usenet. . . . My website provides the service of making the material that is freely available on Usenet available to people with the use of an ordinary Web browser such as Netscape's Communicator or Microsoft's Internet Explorer. . . . [¶] . . . My Internet site works by utilizing a computer program that scans certain Usenet groups and selects those articles that fit into a certain criteria that I have established. . . ."

Defendant uses a software program to identify and copy sexually explicit photographs posted on the Usenet. Using this software, defendant, over a period of time, copied and displayed the models' photographs, without plaintiff's permission, on defendant's commercial Web site, Justpics. Justpics is not a newsgroup or bulletin board system. Justpics charges its customers a monthly membership fee to view the erotic photographs retrieved by Justpics from the Usenet. The models' photographs were displayed on Justpics in their original state, but without plaintiff's accompanying text, captions, and headers.

Defendant concedes that Justpics's unauthorized display of the models' photographs is not protected by any privilege afforded to news reporting or commentary on matters of public interest. None of the models depicted in the photographs is a known celebrity. Similarly, none of the photographers is recognized "as a master of the genre."

Plaintiff concedes that defendant did not use the models' photographs in a manner that implied the existence of a commercial endorsement of defendant's actions: "Neither the models, photographers, nor (Plaintiff) KNB Enterprises has been used by defendants as a 'spokesman' or presented as endorsing the actions of defendants in any way."

### Discussion

■ The right to prevent others from appropriating one's photograph for commercial gain has evolved from the common law right of privacy. The "four distinct torts identified by Dean Prosser and grouped under the privacy rubric are: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness. [Citations.]" (*Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 416 [198 Cal.Rptr. 342], fn. omitted.) ■ This action concerns the fourth category, appropriation for the defendant's advantage of the models' photographs, which is also referred to as the right of publicity. (*Wendt v. Host Intern., Inc.* (9th Cir. 1997) 125 F.3d 806, 811.)

The right of publicity has come to be recognized as distinct from the right of privacy. In the commercial arena, celebrity endorsements are often considered a valuable marketing tool. What may have originated as a concern for the right to be left alone has become a tool to control the commercial use and, thus, protect the economic value of one's name, voice, signature, photograph, or likeness. In 1971, California enacted section 3344, a commercial appropriation statute which complements the common law tort of

appropriation. Section 3344, subdivision (a) provides in relevant part: "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof. In addition, in any action brought under this section, the person who violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by him or her as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages. . . ."[5]

Although the unauthorized appropriation of an obscure plaintiff's name, voice, signature, photograph, or likeness would not inflict as great an economic injury as would be suffered by a celebrity plaintiff, California's appropriation statute is not limited to celebrity plaintiffs. Section 3344 provides for minimum damages of $750, even if no actual damages are proven. In discussing a similar Nevada statute, the Nevada Supreme Court noted that the legislative purpose for providing a minimum recovery for noncelebrities is "to discourage such appropriation." (*Hetter v. District Court* (1994) 110 Nev. 513, 519 [874 P.2d 762, 765].)[6]

---

[5]As originally enacted, section 3344 applied only to an unauthorized use "for purposes of advertising products, merchandise, goods or services, or for purposes of solicitation of purchases of products . . . ." (Stats. 1971, ch. 1595, § 1, p. 3426.) In 1984, the statute was amended to encompass any unauthorized use "on or in products, merchandise, or goods . . . ." (Stats. 1984, ch. 1704, § 2, p. 6172.) Accordingly, the statute no longer requires that the unauthorized use occur in a product advertisement or endorsement or other such solicitation of purchase. Cases decided under the pre-1984 version of section 3344, such as *Eastwood v. Superior Court, supra,* 149 Cal.App.3d 409, must be read with this change in mind. In addition, some postamendment cases should be read with caution on this point. (See, e.g., *Fleet v. CBS, Inc., supra,* 50 Cal.App.4th at p. 1918 [quoting *Eastwood* for the outdated proposition that a commercial use is required to state a § 3344 claim], and *Abdul-Jabbar v. General Motors Corp.* (9th Cir. 1996) 85 F.3d 407, 414 [same].)

[6]In *PETA v. Bobby Berosini, Ltd.* (1990) 111 Nev. 615 [895 P.2d 1269], the Nevada court stated the following regarding the different privacy and publicity interests of famous and obscure plaintiffs: "When . . . the name of a famous or celebrated person is used unauthorizedly, that person's main concern is not with bruised feelings, but rather, with the commercial loss inherent in the use by another of the celebrated name or identity. The commercial or property interest that celebrities have in the use of their names and identities is protected under what has been termed the 'right of publicity.' [¶] There is a certain reciprocity between the two kinds of interests, personal and proprietary; and, accordingly, the more the aspects of one tort are present, the less likely are the aspects of the other tort to be present. The more obscure the plaintiffs are, the less commercial value their names have and the more such plaintiffs will be seeking to redress personal interests in privacy in a common law appropriation action, and not commercial or property interests in their name or likeness as a claimed

In this case, none of the models is a celebrity. Their anonymity, however, is allegedly a valuable asset in the marketing of erotic photographs. Plaintiff alleged in the complaint: "Although it is hard to measure how much the defendants profited by their acts, they profited in three ways. First, they got sales. The additional photos encouraged consumers to buy access to their sites—i.e., memberships—and also helped the defendants retain existing members. The photos were especially valuable because many of the models were new to modeling, and 'new faces' are prized in the adult field and difficult to find. [¶] . . . Second, the defendants saved money. Their copying—rather than creation or purchase—of photos, saved the costs of scouting for and casting models, photographer fees, model fees, film and processing, studios, photo scanning and digitizing, and other direct and incidental expenses. [¶] . . . Third, the defendants saved time—by substituting a few moments of copying for what could have been days or weeks of work in hiring photographers, casting models, processing and scanning photos, and other activities."

The issue we face is whether the noncelebrity models' section 3344 claims, which plaintiff asserts by right of assignment, are preempted by federal copyright law. ▮ "California law concerning right to publicity, as any state statute or law, is subject to preemption under the supremacy clause of the United States Constitution if it 'actually conflicts with a valid federal statute' or ' " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " ' (*Edgar* v. *MITE Corp.* (1982) 457 U.S. 624, 631 [73 L.Ed.2d 269, 276, 102 S.Ct. 2629].) In addition, 'when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. [Citation.]' (*California Federal S. & L. Assn.* v. *Guerra* (1987) 479 U.S. 272, 280 [93 L.Ed.2d 613, 623, 107 S.Ct. 683].) 17 United States Code section 301, part of the 1976 Copyright Act . . . expressly prohibits states from legislating in the area of copyright law. It provides: 'On and after January 1, 1978, all legal or equitable rights that are the equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the

---

violation of a right of publicity. The more famous and celebrated the plaintiffs, the less injury is likely to be claimed to their privacy interests, their interest in being 'left alone,' because their names and likenesses already have wide recognition and are not appropriate subjects for invasion of personal privacy. Generally speaking, a private person will be seeking recovery for the appropriation tort, and a celebrity will be recovering for the right of publicity tort." (*Id.* at pp. 636-637 [895 P.2d at pp. 1283-1284], italics omitted.)

common law or statutes of any State.' [¶] Thus, for preemption to occur under the Act, two conditions must be met: first, the subject of the claim must be a work fixed in a tangible medium of expression and come within the subject matter or scope of copyright protection as described in sections 102 and 103 of 17 United States Code, and second, the right asserted under state law must be equivalent to the exclusive rights contained in section 106. [Citations.]"[7] (*Fleet v. CBS, Inc.*, *supra*, 50 Cal.App.4th at pp. 1918-1919.)

 There can be no dispute that photographs are copyrightable. According to the Nimmer treatise on copyright law: "Photographs clearly fall within the Section 102(a)(5) classification of 'pictorial, graphic and sculptural works.' The Copyright Act does not contain a definition of a photograph, but subject to the fixation requirement, it would appear to include any product of the photographic process, whether in print or negative form, including filmstrips, slide films and individual slides. . . . [¶] It is, of course, fundamental that copyright in a work protects against unauthorized copying, not only in the original medium in which the work was produced, but also in any other medium as well. Thus, copyright in a photograph will preclude unauthorized copying by drawing or in any other form, as well as by photographic reproduction." (1 Nimmer on Copyright (1999) § 2.08 [E], pp. 2-128 to 2-129, fns. omitted.)

 It is also undisputed that the unauthorized commercial display of the copyrighted photographs on defendant's Web site constituted an infringement of plaintiff's exclusive 17 United States Code section 106 rights. The question that remains, however, is whether plaintiff's statutory appropriation claim based on the violation of the models' section 3344 rights is the equivalent of a copyright infringement claim.[8]

The facts of this case do not quite fit those of other similar cases. We will briefly discuss some of the most relevant cases to assist our analysis.

---

[7]Section 106 of 17 United States Code gives the copyright holder the exclusive rights "(1) to reproduce the copyrighted work in copies or phonorecords; [¶] (2) to prepare derivative works based upon the copyrighted work; [¶] (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; [¶] (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; [¶] (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and [¶] (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission."

[8]Plaintiff has not alleged a claim for unfair competition, presumably due to preemption problems. (See *Marobie-FL v. National Ass'n of Fire Equip. Dist.* (N.D.Ill. 1997) 983 F.Supp. 1167, 1179-1181 [unfair competition claim for unauthorized copying and distribution of clip art on infringer's World Wide Web page was held to be preempted by federal copyright law]; *Data General v. Grumman Systems Support Corp.* (D.Mass. 1992) 795 F.Supp. 501, 506 [state

In *Hoffman v. Capital Cities/ABC, Inc.* (C.D.Cal. 1999) 33 F.Supp.2d 867, actor Dustin Hoffman sued the publisher of Los Angeles Magazine for publishing his digitally altered still photograph copied without permission from the motion picture film Tootsie (Columbia Pictures 1982). The original photograph had depicted Hoffman, "in character, wearing a long red dress and standing in front of an American flag with the printed material, 'What do you get when you cross a hopelessly straight starving actor with a dynamite red sequined dress?' and 'You get America's hottest new actress.' " (*Id.* at p. 870.) The photograph published in the magazine was digitally altered to combine "Mr. Hoffman's face and head and the American flag from the original still photograph, and a new photograph of a male model's body clothed in the [butter-colored] silk gown designed by Richard Tyler and high-heel shoes designed by Ralph Lauren." (*Ibid.*)

The magazine article accompanying Hoffman's altered photograph promoted the fashion designs of Richard Tyler and Ralph Lauren. The magazine publisher failed to "obtain Mr. Hoffman's consent to commercially endorse or 'shill' for any fashion designer or advertiser or the magazine." (*Hoffman v. Capital Cities/ABC, Inc., supra,* 33 F.Supp.2d at p. 871.) In addition, the publisher did not seek or obtain the permission of the copyright holder, Columbia Pictures, to use Hoffman's photograph in the magazine. (*Ibid.*)

In discussing the publisher's federal copyright preemption defense, the *Hoffman* court found that neither of the two required conditions had been met: "Defendant, Los Angeles Magazine, Inc.'s copyright preemption defense is unavailing. What Mr. Hoffman seeks to protect—his name, face and persona—are not 'writings' or 'works of authorship' that come within the subject matter of copyright. 17 U.S.C. § 301. Moreover, the rights that Mr. Hoffman seeks to protect are not 'equivalent' to the rights protected by the Copyright Act. The claims asserted by Mr. Hoffman involve extra elements that are different in kind from those in a copyright infringement case. 17 U.S.C. § 301." (*Hoffman v. Capital Cities/ABC, Inc., supra,* 33 F.Supp.2d at p. 875.) With regard to the latter requirement, the district court agreed with Hoffman's claim that "his right to protect the use of his own name and image *is separate* from the copyrighted interest of Columbia in the motion picture *Tootsie*." (*Id.* at p. 871, italics added.)

In *Fleet v. CBS, Inc., supra,* 50 Cal.App.4th 1911, Division Four of this district found the section 3344 right of publicity claims of several motion picture actors were preempted by the federal Copyright Act. The actors in *Fleet* were disgruntled over not having been paid for working on a film.

law claims (other than conversion and misappropriation of trade secrets) for the alleged use and copying of plaintiff's software were held to be preempted by federal copyright law].)

When the defendant, CBS, Inc., which owned the exclusive distribution rights to the film, sought to distribute it on videotape, the actors sued. Among other things, the complaint alleged CBS had violated section 3344 by using for advertising and promotional purposes still photographs of the plaintiffs taken from the film.

In *Fleet*, Division Four held the actors' section 3344 claims against CBS were preempted by the Copyright Act. Division Four's analysis focused on the fact that the actors could have protected their dramatic performances in the film by retaining a copyright.[9] Division Four distinguished other cases in which the right of publicity claim was held not to be preempted by the Copyright Act on the basis that in those cases, "the right sought to be protected was not copyrightable—Clint Eastwood's likeness captured in a photograph; Kareem Abdul-Jabbar's former name; Bette Midler's distinctive vocal style; Vanna White's distinctive visual image, etc. The plaintiffs in those cases asserted no copyright claims *because they had none to assert.* Here, by contrast, appellants seek to prevent CBS from using performances captured on film. These performances were copyrightable and appellants could have claimed a copyright in them . . . ."[10] (*Fleet v. CBS, Inc., supra,* 50 Cal.App.4th at pp. 1921-1922.)

[9]Division Four acknowledged the actors had never disputed CBS's contention that as employees of the production company, the actors had voluntarily relinquished any copyright in their performances in the film, which constituted a work made for hire under the Copyright Act. (*Fleet v. CBS, Inc., supra,* 50 Cal.App.4th at pp. 1916-1917.) The work made for hire doctrine gives the employer the exclusive copyright to the work unless the parties have expressly agreed otherwise in a signed, written agreement. (17 U.S.C. §§ 101, 201.) Division Four nevertheless decided the case on the basis of the actors' theoretical right to copyright their performances in the film. The court stated: "[W]e have not been called on to decide, and do not decide, whether the actors in the film were employees or whether the works made for hire doctrine otherwise applies. Accordingly, this aspect of the decision has no relevance to the present case." (*Fleet v. CBS, Inc., supra,* 50 Cal.App.4th at p. 1923.)

[10]See *Eastwood v. Superior Court, supra,* 149 Cal.App.3d 409 (valid § 3344 claim stated where the National Enquirer had allegedly used Clint Eastwood's name and photograph on its newspaper cover, without his consent, together with a deliberately fictional account, to promote its publication); *Abdul-Jabbar v. General Motors Corp., supra,* 85 F.3d 407 (valid § 3344 and tort claims stated where the defendants had allegedly used the name "Lew Alcindor" in a television commercial without the plaintiff's consent); *Midler v. Ford Motor Co.* (9th Cir. 1988) 849 F.2d 460, 462 (claim stated under tort law but not § 3344 where the defendant had allegedly used a celebrity voice impersonator to record one of the celebrity's signature tunes in a commercial); and *White v. Samsung Electronics America, Inc.* (9th Cir. 1992) 971 F.2d 1395 (claim stated under tort law but not § 3344 where the defendant had allegedly used a robot to imitate the physical appearance of Vanna White, a well-known television personality).

The Ninth Circuit's rulings in *Midler, White,* and another similar case, *Waits v. Frito-Lay, Inc.* (9th Cir. 1992) 978 F.2d 1093 (reaffirming the *Midler* ruling that a voice is not coyrightable and, hence, a tort claim for celebrity voice misappropriation is not preempted by the Copyright Act), have been criticized by Nimmer. Nimmer points out that the Copyright Act allows "soundalike" recordings (17 U.S.C. § 114(b)) and fair use parodies. Nimmer

Whether or not the actors in *Fleet could* have claimed a copyright in their performances, *Fleet* stands for the solid proposition that performers in a copyrighted film may not use their statutory right of publicity to prevent the *exclusive* copyright holder from distributing the film. As between the *exclusive* copyright holder and any actor, performer, model, or person who appears in the copyrighted work, the latter may not preclude the former from exercising the rights afforded under the exclusive copyright by claiming a violation of the right of publicity. In an action against the exclusive copyright holder, "the state law right to publicity action is preempted where the conduct alleged to violate the right consists only of copying the work in which the plaintiff claims a copyright. [Citations.]" (*Michaels v. Internet Entertainment Group, Inc.* (C.D.Cal. 1998) 5 F.Supp.2d 823, 837.)[11]

This principle was explained in a New York decision, *Russell v. Marboro Books* (1959) 18 Misc.2d 166 [183 N.Y.Supp.2d 8]. Mary Jane Russell, a famous professional model, signed an unrestricted release allowing a well-known photographer, Richard Avedon, to use a photograph of the model taken for a bookstore's advertising campaign. The photograph was published for its intended purpose without incident. Thereafter, however, the bookstore asked Avedon for the negative, falsely claiming that more bookstore posters were needed. The bookstore sold the negative to a bedsheet manufacturer, which altered the photograph to give the false appearance that Russell "had posed for a bedsheet advertisement portraying a willing call girl waiting to be used by a stranger whetting his sexual appetite." (18 Misc.2d at p. 171 [183 N.Y.Supp.2d at p. 17].) The New York court held that Russell was entitled to sue for violation of her statutory right of publicity. The court found that although plaintiff had given an unrestricted release permitting the use of her photograph without her inspection and approval, she did not, as a matter of law, agree to "the dissemination of all types of altered pictures or of libelous material." (*Id.* at p. 182 [183 N.Y.Supp.2d at p. 28].)

In this case, the models released their rights in the photographs to plaintiff. Plaintiff did not, however, consent to defendant's unauthorized use of the photographs. Accordingly, we distinguish this case from *Fleet* because this is not a situation where the models are asserting a right of publicity claim against the exclusive copyright holder in an effort to halt the authorized distribution of their photographs. This case is closer, although not entirely similar, to *Hoffman*, *Michaels*, and *Russell*, in that plaintiff is

questions whether state law may "forbid that which Congress intended to validate[.]" (1 Nimmer on Copyright, *supra*, § 1.01 [B][3][b], p. 1-62.)

[11]In *Michaels*, a celebrity couple—musician Bret Michaels and actress Pamela Anderson Lee—obtained a preliminary injunction halting the allegedly unauthorized Internet distribution of a copyrighted videotape of the couple having sex. The court in *Michaels* held that the plaintiffs' section 3344 claim was not preempted by the Copyright Act.

asserting the models' statutory right of publicity claim to halt the *un*authorized display of the photographs. In this case, although the models consented to have plaintiff display, copy, publish, or assign the photographs as he pleased, plaintiff did not assign those rights to defendant.

Defendant contends that in this case, the models' statutory right of publicity claims are indistinguishable from plaintiff's copyright infringement claim because the only wrong alleged was the unauthorized publication of the copyrighted photographs, or an infringing use. In the *Hoffman* case, on the other hand, the magazine publisher created the false impression that Dustin Hoffman was lending his endorsement by apparently consenting to be shown wearing the designers' creations. This case differs from *Hoffman* in that here, the parties have stipulated the photographs were not used in a manner to create the false impression of an endorsement.[12] Accordingly, defendant contends, the extra element needed to avoid preemption, use of the photographs for endorsement purposes, is not present in this case.

Like the magazine publisher in *Hoffman*, the Internet subscription service in *Michaels* and the film distributor in *Fleet* also used the celebrity plaintiffs' names and likenesses for advertising and promotional purposes. In that sense, *Fleet* and *Michaels* arguably lend support to defendant's position that something more than a mere infringing use is required to avoid preemption of a section 3344 claim.[13] Division Four cited Professor Nimmer's treatise and others as authority for this point, stating: "We concur with these authorities, and also with Professor Nimmer (1 Nimmer on Copyright [(May 1996)] § 1.01[B][1], p. 1-14), in holding that a right is equivalent to rights within the exclusive province of copyright when it is infringed by the mere act of reproducing, performing, distributing, or displaying the work at issue. A claim asserted to prevent nothing more than the reproduction, performance, distribution, or display of a dramatic performance captured on film is subsumed by copyright law and preempted." (*Fleet v. CBS, Inc., supra*, 50 Cal.App.4th at p. 1924.)

---

[12]Given the noncelebrity status of the models in this case, we are not surprised by the stipulation. Had one or more of the models been famous, however, such a stipulation would have been surprising. In the *Hoffman* case, the magazine's intent to create the false impression of an endorsement was inferred from Dustin Hoffman's celebrity status. That same inference would not have been justified had an unknown model been used in Hoffman's place. In our view, determining preemption of a plaintiff's section 3344 claim on the basis of the plaintiff's celebrity status would be violative of California law. Under California law, the statutory right of publicity exists for celebrity and noncelebrity plaintiffs alike. Accordingly, we do not find the absence of intent to create the false impression of an endorsement to be determinative of the preemption issue.

[13]The court in *Michaels* did not discuss preemption at length. The court simply relied upon the alleged appropriation of the plaintiffs' names and likenesses for advertisement purposes to supply the additional element, unrelated to copyright infringement, necessary to avoid preemption. (*Michaels v. Internet Entertainment Group, Inc., supra*, 5 F.Supp.2d at p. 837.)

The actual language of Nimmer's treatise, however, leads us to a different conclusion. The passage from Nimmer relied upon by the court in *Fleet* states: "Abstracting to the realm of principle, if under state law the act of reproduction, performance, distribution, or display, no matter whether the law includes all such acts or only some, will *in itself* infringe the state-created right, then such right is pre-empted. But if qualitatively other elements are required, instead of, or in addition to, the acts of reproduction, performance, distribution, or display, in order to constitute a state-created cause of action, then the right does not lie 'within the general scope of copyright,' and there is no pre-emption." (1 Nimmer on Copyright, *supra*, § 1.01 [B][1], p. 1-13, fns. omitted.)

*Fleet* failed to mention, however, Nimmer's caveat that right of publicity claims generally are not preempted by the Copyright Act. According to Nimmer: "Invasion of privacy may sometimes occur by acts of reproduction, distribution, performance, or display, but inasmuch as the essence of the tort does not lie in such acts, pre-emption should not apply. The same may be said of the right of publicity. [¶] . . . A *persona* can hardly be said to constitute a 'writing' of an 'author' within the meaning of the Copyright Clause of the Constitution. *A fortiori,* it is not a 'work of authorship' under the Act. Such name and likeness do not become a work of authorship simply because they are embodied in a copyrightable work such as a photograph." (1 Nimmer on Copyright, *supra*, § 1.01 [B][1][c], pp. 1-22 to 1-23, fns. omitted.)

Accordingly, we would limit *Fleet*'s broad language regarding preemption of the actors' section 3344 claims to the unique facts of that case. In our view, a section 3344 claim is preempted under *Fleet* where an actor or model with no copyright interest in the work seeks to prevent the exclusive copyright holder from displaying the copyrighted work. We do not believe a section 3344 claim is preempted under *Fleet* where, as here, the defendant has no legal right to publish the copyrighted work.

Returning to the two-part test for determining preemption (the subject of the claim must be a work fixed in a tangible medium of expression and come within the subject matter or scope of copyright protection, and the right asserted under the state law must be equivalent to the exclusive rights contained in 17 U.S.C. § 106), we conclude neither condition has been met in this case. First, the subjects of the claims are the models' likenesses, which are not copyrightable even though "embodied in a copyrightable work such as a photograph." (1 Nimmer on Copyright, *supra*, § 1.01 [B][1][c], p. 1-23, fn. omitted.) Second, the right asserted under the state statute, the right of publicity, does not fall within the subject matter of copyright. (*Id.* at pp.

1-22 to 1-23.) Accordingly, we conclude the models' section 3344 claims are not preempted by federal copyright law.

## DISPOSITION

We reverse the summary judgment for defendant and remand for further proceedings. Plaintiff is awarded costs on appeal.

Vogel (Miriam A.), J., and Masterson, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 14, 2000.