**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PATRICK MALONEY, on behalf of himself and all others similarly situated; TIM JUDGE, on behalf of himself and all others similarly situated,
*Plaintiffs-Appellants*,

v.

T3MEDIA, INC., DBA Paya.com, a Colorado corporation,
*Defendant-Appellee*.

No.15-55630

D.C. No.
2:14-cv-05048-AB-VBK

OPINION

Appeal from the United States District Court
for the Central District of California
Andre Birotte, Jr., District Judge, Presiding

Argued and Submitted February 17, 2017
Pasadena, California

Filed April 5, 2017

Before:  MILAN D. SMITH, JR. and JOHN B. OWENS,
Circuit Judges, and EDWARD R. KORMAN,*
District Judge.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY**

### California Anti-SLAPP Statute / Copyright Act

The panel affirmed the district court's order granting T3Media's special motion to strike, pursuant to California's anti-SLAPP statute, the action brought by plaintiffs/former student-athletes Patrick Maloney and Tim Judge, alleging that T3Media exploited their likenesses commercially.

Plaintiffs alleged that T3Media exploited their likenesses by selling non-exclusive licenses permitting consumers to download photographs from the National Collegiate Athletic Association's Photo Library for non-commercial use. Plaintiffs asserted statutory and common law publicity-right claims and an unfair competition claim under California law.

The California anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16, was enacted to allow for early dismissal of meritless first amendment cases aimed at chilling expression though litigation.

---

* The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Section 301 of the federal Copyright Act adopted a two-part test to determine whether a state law claim was preempted by the Act; first, whether the subject matter of the state claim fell within the subject matter of copyright, as described in 17 U.S.C. §§ 102 and 103; and second, if so, whether the rights asserted under state law were equivalent to the rights contained in 17 U.S.C. § 106.

At step one of the Copyright Act test, the panel held that the subject matter of the state law claims fell within the subject matter of copyright. Specifically, the panel held that a publicity-right claim may proceed when a likeness is used non-consensually on merchandise or in advertising; but where a likeness has been captured in a copyrighted artistic visual work and the work itself is being distributed for personal use, a publicity-right claim is little more than a thinly-disguised copyright claim because it seeks to hold a copyright holder liable for exercising his exclusive rights under the Copyright Act. The panel concluded that plaintiffs' publicity-right claims and the derivative Unfair Competition Law claim challenged control of the artistic work itself, and accordingly, the subject matter of the state law claims fell exclusively within the subject matter of copyright.

At step two, the panel held that the rights plaintiffs asserted were equivalent to rights within the general scope of copyright.

The panel concluded that plaintiffs' state law claims were preempted by section 301 of the federal Copyright Act because plaintiffs sought to hold T3Media liable for exercising rights governed exclusively by copyright law. The panel further held that plaintiffs could not demonstrate a reasonable probability of prevailing on their challenged

claims; and the district court did not err in granting the special motion to strike, and dismissing without leave to amend.

**COUNSEL**

John M. DeStefano (argued), Robert B. Carey, and Leonard W. Aragon, Hagens Berman Sobol Shapiro LLP, Phoenix, Arizona, for Plaintiffs-Appellants.

Kelli L. Sager (argued), Karen A. Henry, Eric M. Stahl, and Diana Palacios, Davis Wright Tremaine LLP, Los Angeles, California, for Defendant-Appellee.

Michael Rubin and P. Casey Pitts, Altshuler Berzon LLP, San Francisco, California, for Amici Curiae the National Football League Players Association, the Major League Baseball Players Association, the National Hockey League Players' Association, the National Basketball Players Association, and the Major League Soccer Players Union.

Sean Sansiveri, Washington, D.C., as and for Amicus Curiae National Football League Players Association.

David Prouty, New York, New York, as and for Amicus Curiae Major League Baseball Players Association.

Don Zavelo, Toronto, Ontario, as and for Amicus Curiae Counsel National Hockey League Players' Association.

Gary Kohlman, New York, New York, as and for Amicus Curiae National Basketball Players Association.

Jon Newman, Sherman Dunn Cohen Leifer & Yellig P.C., Washington, D.C., for Amicus Curiae Major League Soccer Players Union.

Nancy E. Wolff, Cowan DeBaets Abrahams & Sheppard LLP, New York, New York, for Amici Curiae Associated Press, Digital Media Licensing Association, Getty Images (US), Inc., Graphic Artists Guild, National Press Photographers Association, Inc., PhotoShelter, Inc., Professional Photographers of America, Shutterstock, Inc. and Zuma Press, Inc.

Bruce D. Brown and Gregg P. Leslie, Reporters Committee for Freedom of the Press, Washington, D.C., for Amici Curiae the Reporters Committee for Freedom of the Press and 22 Media Organizations.

---

**OPINION**

M. SMITH, Circuit Judge:

Former student-athletes Patrick Maloney and Tim Judge allege that defendant T3Media, Inc. (T3Media) exploited their likenesses commercially by selling non-exclusive licenses permitting consumers to download photographs from the National Collegiate Athletic Association's (NCAA) Photo Library for non-commercial art use. Maloney and Judge assert statutory and common law publicity-right claims and an unfair competition claim under California law. The district court held that the federal Copyright Act preempts plaintiffs' claims and granted T3Media's special motion to strike pursuant to California's anti-SLAPP statute. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties

Plaintiffs Patrick Maloney and Tim Judge are former NCAA student-athletes who played for the Catholic University (CU) men's basketball team between 1997 and 2001. In their final year at CU, they made it all the way to the Division III national championship game, and helped lead the underdog Cardinals to an upset 76-62 victory over the William Paterson University Pioneers. The game's drama was captured in a series of photographs depicting the plaintiffs in play, and later posing as members of the team with CU's first-ever national championship trophy. The NCAA owns or controls the copyright to these photographs. It accordingly placed them into its collection, the NCAA Photo Library.

T3Media provides storage, hosting, and licensing services for a wide variety of digital content. In 2012, it contracted with the NCAA to store, host, and license the images in the NCAA Photo Library. The NCAA Photo Library itself contains thousands of photographs chronicling seventy years of NCAA sports history. Until 2014, T3Media made the photographs available to the public through its website, Paya.com.

Consumers could view digital thumbnails of the images contained in the NCAA Photo Library on Paya.com, and obtain for $20 to $30 a non-exclusive license permitting them to download a copy of a chosen photograph. Brief descriptions of the events depicted in the images

accompanied the digital thumbnails.[1]  Users were also required to assent to a "Content License Agreement" in order to download one of the photographs.  Pursuant to that agreement, consumers could "use a single copy of the image for non-commercial art use."  Consumers did not obtain "any right or license to use the name or likeness of any individual (including any athlete, announcer, or coach) appearing in the Content in connection with or as an express or implied endorsement of any product or service."

**B.  Procedural History**

Plaintiffs commenced this action in the Central District of California in June 2014.  They allege that T3Media exploited their names and likenesses commercially by selling photographs on Paya.com depicting their 2001 triumph.  They purport to represent a putative class "of all current and former NCAA student-athletes whose names, images, and likenesses have been used without their consent by [T3Media] for the purpose of advertising, selling, or soliciting purchases of the photographs themselves."  The complaint asserts claims for violation of California's statutory right of publicity, Cal. Civ. Code § 3344, common

---

[1] For example, the caption accompanying a picture of Magic Johnson provided: "Michigan State's Earvin 'Magic' Johnson (33) looks pleased with his performance during the NCAA National Basketball Championships in Salt Lake City, UT, Special Events Center.  Johnson was named Most Outstanding Player during the tournament with 17 rebounds and 53 points.  Michigan State defeated Indiana State 75-64 to win the title."

law right of publicity, and Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.* [2]

In October 2014, T3Media moved to strike the complaint pursuant to California's anti-SLAPP statute. Cal. Civ. Proc. Code § 425.16. T3Media argued that the federal Copyright Act preempts plaintiffs' claims, that they are barred by the First Amendment, and that California's statutory exemption for news, public affairs, or sports broadcasts or accounts precludes liability for any publicity-right violations. The district court granted T3Media's motion to strike on March 6, 2015, holding that the Copyright Act preempts plaintiffs' claims, and declining to reach the other defenses.

According to the district court, the plaintiffs asserted rights that fell within the subject matter of copyright because their claims derived from the licensing of copyrighted photographs, which were original works of authorship fixed in a tangible medium of expression under the circumstances. The court rejected plaintiffs' argument that a publicity-right claim involving a photograph is not subject to preemption. It distinguished between claims derived from "selling a

---

[2] "A common law cause of action for appropriation of name or likeness may be pleaded by alleging (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Fleet v. CBS, Inc.*, 50 Cal. App. 4th 1911, 1918 (1996). In addition, "to plead the statutory remedy provided in Civil Code section 3344, there must also be an allegation of a knowing use of the plaintiff's name, photograph or likeness for purposes of advertising or solicitation or purchases." *Id.* Further, "judicial construction of section 3344 has imposed an additional requirement. A 'direct' connection must be alleged between the use and the commercial purpose." *Id.* Lastly, plaintiffs' UCL claim is derivative of their publicity-right claims because it invokes alleged publicity-right violations as its basis.

copyrighted photograph containing an athlete's likeness," which it said require preemption, and claims based on "using the athlete's likeness contained in the photograph for some other purpose," which it said do not. The district court also concluded that plaintiffs were asserting rights equivalent to the exclusive rights contained in the Copyright Act because they did not identify a use of their names or likenesses "independent of the display, reproduction, and distribution of the copyrighted images in which they are depicted." Lastly, the district court found that the plaintiffs' UCL claim was derivative of the publicity-right claims, and thus concluded that it failed because the publicity-right claims were preempted by the Copyright Act. The court denied plaintiffs' request for additional discovery because the identified topics did not bear on the issue of preemption. The court also acknowledged that plaintiffs had been afforded "an opportunity to amend and to conduct at least minimal discovery," so it struck the complaint without leave to amend and dismissed the action with prejudice. The court later awarded attorneys' fees in T3Media's favor. Cal. Civ. Proc. Code § 425.16(c)(1). Plaintiffs filed a timely notice of appeal on April 24, 2015.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. "We review the district court's grant of a special motion to strike de novo." *Graham-Sult v. Clainos*, 756 F.3d 724, 735 (9th Cir. 2013). "The district court's decision not to permit additional discovery pursuant to Federal Rule of Civil Procedure 56(f) is reviewed for abuse of discretion." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001).

## ANALYSIS

California's anti-SLAPP statute permits defendants to file a "special motion to strike" any "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue."  Cal. Civ. Proc. Code § 425.16(b)(1).  "The anti-SLAPP statute was enacted to allow for early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation."  *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003) (quotation marks omitted).  Its "burden-shifting mechanism" weeds out lawsuits "brought to deter common citizens from exercising their political or legal rights or to punish them for doing so."  *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 887–88 (9th Cir. 2016) (internal quotation marks omitted).

At step one of the anti-SLAPP analysis, "the moving defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech."  *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013).  At step two, assuming that showing has been made, the burden shifts to the plaintiff "to establish a reasonable probability that it will prevail on its claim[s]."  *Id.*

Here, plaintiffs concede that their suit arises from acts in furtherance of T3Media's right to free speech.  That conclusion is sound because their claims stem from the publication and distribution of expressive photographs over

the Internet.**[3]** It is thus incumbent on plaintiffs to demonstrate a reasonable probability of prevailing on their challenged claims. T3Media insists that feat is impossible because the federal Copyright Act preempts plaintiffs' claims. We agree.

## Preemption under Section 301 of the Copyright Act

The Copyright Act affords copyright owners the "exclusive rights" to display, perform, reproduce, or distribute copies of a copyrighted work, to authorize others to do those things, and to prepare derivative works based upon the copyrighted work. 17 U.S.C. § 106. The copyright, in other words, gives the owner "the right to control the work," including the decision whether or not to

---

**[3]** The anti-SLAPP statute recognizes four categories of protected speech and petitioning, including "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest," Cal. Civ. Proc. Code § 425.16(e)(3), and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest," *id.* § 425.16(e)(4). T3Media's conduct fits within the former category because it posted the photographs on Paya.com and "[w]eb sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute." *Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (2006); *see also Safari Club Int'l v. Rudolph*, 845 F.3d 1250, 1258–60 (9th Cir. 2017) (defendant's posting of video on YouTube satisfied § 425.16(e)(4)). T3Media's conduct also fits within the latter category because the photographs memorialize cherished moments in NCAA sports history, and California defines "an issue of public interest" broadly. *See Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042–44 (2008) (concluding an issue of public interest is "any" issue in which the public is interested); *Rivero v. Am. Fed'n of State, Cty., and Mun. Emps., AFL-CIO*, 105 Cal. App. 4th 913, 920, 924 (2003).

make the work available to the public. *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006).

Section 301 of the Act seeks "to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works," so long as the rights fall "within the scope of the Federal copyright law." H.R. Rep. No. 94-1476, at 130 (1976). "We have adopted a two-part test," in accordance with section 301, "to determine whether a state law claim is preempted by the Act." *Laws*, 448 F.3d at 1137. First, we decide "whether the 'subject matter' of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103." *Id.* Second, assuming it does, we determine "whether the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106, which articulates the exclusive rights of copyright holders." *Id.* at 1138.

Here, the parties joust solely with respect to step one and assert competing rules that seek to define the boundary between copyright preemption and state law rights of publicity. Plaintiffs maintain that photograph-based publicity-right claims categorically fall outside the subject matter of copyright because such claims protect an individual's persona, which itself cannot be fixed in a tangible medium of expression. T3Media, by contrast, insists that the publicity right protects against the non-consensual use of one's name or likeness on merchandise or in advertising. T3Media would permit publicity-right claims to proceed in those contexts, but find preemption where, as here, a likeness has been captured in an artistic work and the work itself is being distributed for personal use.

The right of publicity seeks to prevent commercial exploitation of an individual's identity without that person's

consent.  *See Hilton v. Hallmark Cards*, 599 F.3d 894, 910 (9th Cir. 2009) (stating that the "core" of the right of publicity is preventing "merchandising [of] a celebrity's image without that person's consent"); *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1031 (3rd Cir. 2008) (stating that the "core" of the publicity right "is the right not to have one's identity used in advertising"); *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005) ("The basis of a right of publicity claim concerns the message—whether the plaintiff endorses, or appears to endorse the product in question."). Mindful of that premise, we conclude that a publicity-right claim is not preempted when it targets non-consensual *use* of one's name or likeness on merchandise or in advertising. But when a likeness has been captured in a copyrighted artistic visual work and the work itself is being distributed for personal use, a publicity-right claim interferes with the exclusive rights of the copyright holder, and is preempted by section 301 of the Copyright Act.

Here, Maloney and Judge do not contend that their likenesses were ever used on merchandise or in advertising. They challenge instead the copyright holder's decision to distribute the copyrighted images themselves by selling consumers a non-exclusive license to download a chosen photograph from the NCAA Photo Library for non-commercial art use.  Under these circumstances, the publicity-right claims and the derivative UCL claim challenge "control of the artistic work itself." *Laws*, 448 F.3d at 1142.  Because plaintiffs seek to hold T3Media liable for exercising rights governed exclusively by copyright law, the claims are preempted by section 301 of the Copyright Act.

We derive these conclusions from the text of the Copyright Act, our precedents, the reasoning of other circuits, and a leading copyright treatise.

### 1. Step One – The subject matter of the state law claims falls within the subject matter of copyright.

#### a. The statutory text and our precedents.

The "subject matter of copyright" embodies "original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). "Works of authorship include," among other things, "pictorial" works. *Id.* §§ 102(a), (a)(5). Additionally, "[a] work is 'fixed' in a tangible medium of expression when its embodiment in a copy . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of time of more than transitory duration." *Id.* § 101.

Here, the publicity-right claims arise from the licensing of photographs, which plaintiffs concede are expressive "pictorial" works to which "[a] photographer contributes some original elements."[4]  There is also no doubt that a photograph is "sufficiently permanent" to permit it to be perceived "for more than transitory duration." 17 U.S.C. § 101. The "'subject matter' of the state law claim[s]"—the

---

[4] Amici Associated Press et al. insist that "[p]hotographers use their tools and artistic judgment by manipulating lighting, angle, positioning, and timing."

photographs—therefore appears to fall within the subject matter of copyright.  *Laws*, 448 F.3d at 1137.

Plaintiffs resist this conclusion by drilling down on the *content* of a publicity-right claim.  Plaintiffs maintain that the right of publicity—as it pertains to photographs—protects against exploitation of an individual's "likeness" or "persona."  Since those attributes "exist independent of any single photograph," plaintiffs argue that photograph-based publicity-right claims categorically fall outside the "subject matter of copyright."  In other words, plaintiffs insist they do not assert any right in the particular photographic "works of authorship" at issue here.  Instead, they claim that "the personal attributes protected by the right of publicity . . . cannot be 'fixed' in copyrightable form in the same way as an actor's performance or an author's writings."[5]

Plaintiffs draw support for their position primarily from *Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001).  There, clothing retailer Abercrombie & Fitch developed a surfing theme for its catalog, which was the company's "largest advertising vehicle."  *Id.* at 999.  As part of the campaign, Abercrombie purchased photographs depicting the plaintiffs taking part in the 1965 Makaha

---

[5] *See also* MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 1.01[B][1][c] (Matthew Bender, Rev. Ed. 2016) [hereinafter "NIMMER"] ("The 'work' that is the subject of the right of publicity is the persona, i.e., the name and likeness of a celebrity or other individual.  A persona can hardly be said to constitute a 'writing' of an 'author' within the meaning of the Copyright Clause of the Constitution."); J. THOMAS MCCARTHY, THE RIGHTS OF PUBLICITY AND PRIVACY § 11:52 (2d ed. 2016) [hereinafter "MCCARTHY"] ("The picture is not the person. . . . There is only one underlying 'persona' of a person protected by the right of publicity. . . . [T]he exact image in [a] photograph is not the underlying 'right' asserted in a right of publicity case.").

International Surf Championship in Hawaii.  *Id.* at 1000. Abercrombie used the photographs in a section of the catalog entitled "Surf Nekkid."  *Id.*  It also "decided to create t-shirts, exactly like those worn by the [plaintiffs] in the photograph, for sale in the upcoming issue."  *Id.*  These "Final Heat Tees" appeared in the catalog for sale two pages after the pictures of the plaintiffs.  *Id.*  Abercrombie did not obtain at any time the plaintiffs' permission to use the photographs in the catalog.  *Id.*

We held that section 301 of the Copyright Act did not preempt plaintiffs' publicity-right claims.  *Id.* at 1005.  We reasoned that "it is not the publication of the photograph itself, as a creative work of authorship, that is the basis for [plaintiffs'] claims, but rather, it is the use of the [plaintiffs'] likenesses and their names pictured in the published photograph."  *Id.* at 1003.  We observed that "[a] person's name or likeness is not a work of authorship within the meaning of 17 U.S.C. § 102."  *Id.* at 1004.  "This is true," we said, "notwithstanding the fact that [plaintiffs'] names and likenesses are embodied in a copyrightable photograph."[6]  *Id.*

---

[6] *Downing* relied on two other decisions that plaintiffs likewise rely on here.  In *Brown v. Ames*, 201 F.3d 654 (5th Cir. 2000), a record company misappropriated "the names and likenesses" of "individual blues musicians, songwriters, [and] music producers" on the company's CD's, tapes, catalogs, and posters.  *Id.* at 656–57.  The Fifth Circuit found that preemption does not apply because "the tort of misappropriation of a name or likeness protects a person's *persona*[,]" and "[a] *persona* does not fall within the subject matter of copyright." *Id.* at 658.  In *KNB Enterprises v. Matthews*, 78 Cal. App. 4th 362 (2000), the defendant displayed some of the plaintiff's erotic photographs on its website to attract viewers to the site, where it charged customers a monthly fee to view similar photographs.  *Id.* at 366.  The court declined

Contrary to plaintiffs' argument, *Downing* did not mint a categorical rule that publicity-right claims "relating to a likeness in a photograph" are not subject to preemption. Instead, we said that when the "use" of a likeness forms the "basis" of a publicity-right claim, the claim is not preempted. *Downing*, 265 F.3d at 1103–04. We did *not* state that a likeness is the "basis" of a publicity-right claim any time it is fixed in a photograph. The crux of the issue is thus deciding *when* a publicity-right claim seeks to vindicate misuse of an individual's likeness, as opposed to merely interfering with the distribution, display, or performance of a copyrighted work.

On that point, plaintiffs rely almost entirely on the idea that a theoretical line should separate publicity-right claims based on photographs from other works protected by the Copyright Act. They insist that "[a] different preemption rule applies to right-of-publicity claims arising from performances in film and sound recordings as opposed to those arising from a mere likeness in a photograph," and that the latter type of claim is not subject to preemption because "[u]nlike a performance, a person's mere likeness is not a copyrightable contribution to a photograph."

The text of the Copyright Act does not support plaintiffs' construction. Section 301 draws no distinction among different types of copyrighted works when it comes to

to find that the plaintiffs' publicity-right claims were subject to preemption "because a human likeness is not copyrightable, even if captured in a photograph." *Id.* at 365. Neither decision supports plaintiffs' argument here because both cases involve the use of an individual's likeness on unrelated merchandise or in advertising.

federal preemption.**[7]** *See* 17 U.S.C. § 301(a).  It directs attention to sections 102 and 103, which list the categories of works in which copyright protection subsists, suggesting that the same preemption rule applies to all works that are contained within the "subject matter of copyright." *Id.* § 102.  Given that "pictorial" works appear on that list alongside "motion pictures" and "sound recordings," *id.* § 102(a)(5)–(7), there is no textual basis to carve out a preemption rule that applies solely to photographs.

Moreover, our precedents clarify that the distinction pertinent to the preemption of a publicity-right claim is *not* the type of copyrightable work at issue, but rather the way in which one's name or likeness is affected by the *use* of the copyrighted work.

For example, in *Downing*, the publicity-right claim was not permitted to proceed simply because an individual's likeness was fixed in a photograph.  Indeed, it was "not the publication of the photograph itself, as a creative work of authorship," that formed the basis of the publicity-right

---

**[7]** Section 301(a) provides that

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression *and come within the subject matter of copyright as specified by sections 102 and 103*, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a) (emphasis added).

claim. 265 F.3d at 1103. Instead, it was the unauthorized "use of the [plaintiffs'] likenesses" to advertise Abercrombie products, and the creation of "t-shirts, exactly like those worn by the [plaintiffs] in the photograph, for sale" in Abercrombie's catalog. *Id.* The plaintiffs sustained injury to their individual "personas" because their likenesses were exploited commercially without their consent. The plaintiffs were not seeking to use the right of publicity simply to prevent "publication" of an artistic, visual work.

*Laws* bolsters the interpretation that preemption turns on *how* a copyrighted photograph is used. In particular, *Laws* distinguished *Downing* as a case "involv[ing] photographs *used in advertising*." *Id.* at 1141 (emphasis added). We observed that "Abercrombie went well beyond the mere republication of the photograph. . . . Rather, it published the photo in connection with a broad surf-themed advertising campaign, identified the plaintiffs-surfers by name, and offered for sale the same t-shirts worn by the plaintiffs in the photo." *Id.* Importantly, we said that "[Abercrombie] had suggested that the surfers had *endorsed* Abercrombie's t-shirts. Accordingly, [*Downing*] concluded that 'it is not the publication of the photograph itself . . . that is the basis for [plaintiffs'] claims, but rather, it is the use of the [plaintiffs'] likenesses and their names pictured in the published photographs.'"[8] *Id.* (quoting *Downing*, 265 F.3d at 1003) (emphasis added). *Laws* strongly implies that misuse of an individual's likeness is the "basis" of a publicity-right claim when the name or image is exploited in advertising or on merchandise. It correspondingly implies that one's likeness

---

[8] *Laws* also distinguished *Brown*—a case plaintiffs rely on—as one where preemption was not appropriate because the likenesses were used on "compact disks, tapes, catalogs, and posters." *Laws*, 448 F.3d at 1141 (citing *Brown*, 201 F.3d at 656–57).

does *not* form the basis of a publicity-right claim when "the tort action challenges control of the artistic work itself," *id.* at 1142, or involves "the mere republication of the photograph," *id.* at 1141.

In further support of this interpretation, *Laws* appears to reject plaintiffs' reading of *Fleet v. CBS Inc.*, 50 Cal. App. 4th 1911 (1996). In *Fleet*, the plaintiffs were actors in a film, White Dragon, to which the defendant, CBS, Inc., owned the copyright. *Id.* at 1914. Having been denied certain compensation, plaintiffs sued CBS alleging that CBS "did not have permission to utilize their names, pictures, or likenesses in conjunction with any exploitation of the film." *Id.* CBS released the film anyway and included a picture of one of the plaintiffs "on the packaging and [in] advertising materials." *Id.* at 1915. The court held that section 301 of the Copyright Act preempted the plaintiffs' publicity-right claims. *Id.* at 1919. It "agree[d] that as a general proposition Civil Code section 3344 is intended to protect rights which cannot be copyrighted." *Id.* But it found that the "[plaintiffs'] analysis crumbles in the face of one obvious fact: their individual performances in the film White Dragon were copyrightable." *Id.* Once the "performances were put on film, they became 'dramatic work[s]' 'fixed in [a] tangible medium of expression.'" *Id.* (quoting 17 U.S.C. § 102(a)). "At that point," the court said, "the performances came within the scope or subject matter of copyright law protection." *Id.* at 1919–20. Given that the publicity-right claims sought "only to prevent CBS from reproducing and distributing [plaintiffs'] performances in the film," the court concluded that "the[] claims must be preempted by federal copyright law." *Id.* at 1919.

Maloney and Judge read *Fleet*'s holding to be limited to preemption of dramatic performances, and not to include

photographs, because it observes that "[t]he celebrity who has merely had his picture taken has not engaged in a 'dramatic work' or other 'work of authorship,' and, as Professor Nimmer said, would be afforded no protection under federal copyright law." *Id.* at 1920. They believe *Fleet* supports their line between photographs and dramatic performances because *Fleet* adds "*if not for state law*, [the celebrity who had his picture taken] would have no remedy against those who would misappropriate his image for their own gain." *Id.* (emphasis added). The "state law," of course, is the right of publicity, so plaintiffs read *Fleet* to support a dichotomy between likenesses in photographs and likenesses in other copyrightable works.

*Laws* explains that in *Fleet*, however, "[s]ince CBS's *use* of plaintiffs' likenesses did not extend beyond the use of the copyrighted material it held, there was no right of publicity at issue, aside from the actors' performances." *Id.* at 1143 (emphasis added). *Laws* does not read *Fleet*, as plaintiffs contend, to draw a line between photographs and performances. Instead, it endorses the practice of looking at how one's likeness is affected by "the use of the copyrighted material"—whether that material is a photograph or something else.

*Laws* itself illustrates the same point. There, Debra Laws recorded a song, "Very Special," to which Elektra obtained the copyright. *Id.* at 1136. Sony then obtained a license from Elektra to sample Laws' recording of "Very Special" in a song by Jennifer Lopez and L.L. Cool J. *Id.* After the song became a hit, Laws brought publicity-right claims alleging that Sony's use of "Very Special" misappropriated her name and voice. *Id.* We held that section 301 of the Copyright Act preempted the publicity-right claims. *Id.*

We distinguished cases where the defendant obtained a license to a song and then imitated the singer's voice, which we said did not necessitate preemption because misappropriation of the voice *itself* was the subject of those publicity-right claims. *Id.* at 1140–41. By contrast, we concluded "it is clear that federal copyright law preempts a claim alleging misappropriation of one's voice when the entirety of the allegedly misappropriated vocal performance is contained within a copyrighted medium." *Id.* at 1141. Applying that rule, we concluded that Laws's publicity-right claim "challenge[d] control of the artistic work itself" and "could hardly be more closely related to the subject matter of the Copyright Act" because Sony had merely licensed copyrighted content and "did not use Laws's image, name, or the voice recording in any promotional materials." *Id.* at 1142.

*Laws* is significant in another respect—it considered the argument "that the subject matter of a copyright claim and a right of publicity claim are substantively different." *Id.* at 1139. Like plaintiffs here, Laws argued "that a copyright claim protects ownership rights to a work of art, while a right of publicity claim concerns the right to protect one's persona and likeness." *Id.* Sony responded that "the subject matter of a right of publicity [claim] in one's voice is not different from a copyright claim when the voice is embodied within a copyrighted sound recording." *Id.* Sony added that "once a voice becomes part of a sound recording in a fixed tangible medium it comes within the subject matter of copyright." *Id.*

We sided with Sony. We acknowledged that "California law recognizes an assertable interest in the publicity associated with one's voice." *Id.* at 1141. But again, we held "that federal copyright law preempts a claim alleging misappropriation of one's voice when the entirety of the

allegedly misappropriated vocal performance is contained within a copyrighted medium." *Id.*

Finally, our most recent decision in this area further buttresses the concept that whether a right of publicity claim is preempted turns on the way in which one's name or likeness is affected by the *use* of a copyrighted work. In *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (9th Cir. 2010), an actor who retained the copyright to the adult films in which he performed sued a video company for "replic[ating] and distribut[ing] a number of [his] copyrighted DVDs without license or authority." *Id.* at 1151. The actor brought publicity-right claims alleging that the defendants "misappropriated his name and 'persona,' in addition to his dramatic performance.'" *Id.* at 1153. The actor contended that his publicity rights were offended by the "unauthorized reproduction, counterfeiting, and sale" of his copyrighted works. *Id.* Thus, he maintained, "the factual basis of his right of publicity claim was the unauthorized reproduction of his performance on the DVDs." *Id.* at 1154.

We held that the Copyright Act preempted the publicity-right claims because the actor's assertion that "defendants misappropriated his name and persona [wa]s based entirely on the misappropriation of the DVDs and [the actor's] performance therein." *Id.* at 1153. In other words, the actor was objecting to the unauthorized distribution and republication of a copyrighted work, not the exploitation of his likeness on an unrelated product or in advertising. We also considered the actor's argument "that it is the use of his name and likeness on the covers of the counterfeit DVDs that violated his right of publicity." *Id.* at 1154. We concluded that even under that theory, the publicity-right claims would still be preempted because "the pictures on the covers of the

DVDs are 'still shots' of the copyrighted video performance." *Id.*

In sum, our cases clarify that a publicity-right claim may proceed when a likeness is used non-consensually on merchandise or in advertising. But where a likeness has been captured in a copyrighted artistic visual work and the work itself is being distributed for personal use, a publicity-right claim is little more than a thinly disguised copyright claim because it seeks to hold a copyright holder liable for exercising his exclusive rights under the Copyright Act.[9]

### b. Persuasive authority.

A trio of cases out of the Third and Eighth Circuits lends further support to this conclusion. In *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3rd Cir. 2008), the Third Circuit considered a clash between "the right of publicity" and "the exploitation of a defendant's copyright." *Id.* at 1028. The plaintiff had narrated several NFL films, and the defendant repurposed some of those copyrighted clips for use "in a cable-television production about the football video game 'Madden NFL 06.'" *Id.* at 1011. Consistent with our holding that there is no categorical preemption rule separating photographs from everything else, the court stated that "[w]here a defendant in a right-of-publicity claim

---

[9] The fact that the non-exclusive licenses were sold for a profit and their price does not alter our analysis. The copyrighted works in *Laws* and *Jules Jordan* were also sold, but the publicity-right claims were still preempted. *See Laws*, 448 F.3d at 1136; *Jules Jordan*, 617 F.3d at 1150–51. More to the point, T3Media's decision to license expressive works for a fee does not change the fact that the publicity-right claims target the *display* and *distribution* of copyrighted photographs for personal use. Moreover, copyright holders are allowed to commercially exploit their copyrights by exercising their exclusive rights under the Copyright Act.

obtained a copyright in a work featuring the plaintiff, courts must separate legitimate exploitations of what Congress intended to be a copyright holder's exclusive rights from *particular uses* that infringe the right of publicity." *Id.* at 1028 (emphasis added).

Turning to that task, the court observed that "when defendants use the work 'for the purposes of trade,' such as in an advertisement, plaintiffs' right-of-publicity claims have not been held to be preempted." *Id.* at 1029 (citing NIMMER § 1.01[B][3][b][iv][l]). Conversely, "when defendants' uses constitute 'expressive works,' right-of-publicity claims have been preempted." *Id.*

Applying that distinction, the Third Circuit concluded that preemption was not appropriate because "[t]he NFL used the sound recordings of [the plaintiff's] voice in a television production promoting the video game." *Id.* at 1030. This was "akin to advertising," *id.*, and the "core" of the publicity right, according to the court, "is the right not to have one's identity used in advertising."[10] *Id.* at 1031.

---

[10] The Third Circuit also "emphasize[d] that courts must circumscribe the right of publicity so that musicians, actors, and other voice artists do not get a right that extends beyond commercial advertisements to other works of artistic expression." *Facenda*, 542 F.3d at 1032. Should courts neglect that task, then "[i]n addition to copyrights, entertainment companies would need additional licenses for artists' rights of publicity in every case." *Id. Facenda* proceeded with the above analysis under the banner of "conflict preemption," but it treated the framework as similarly applicable to the context of express preemption under section 301. *See id.* at 1029 n.13. As to express preemption, *Facenda* found the publicity-right claim was directed to the plaintiff's actual voice, and thus fell outside the subject matter of copyright. *Id.* at 1027–28.

In *Ray v. ESPN, Inc.*, 783 F.3d 1140 (8th Cir. 2015), the Eighth Circuit applied the same distinction that guided the Third Circuit in *Facenda*. The plaintiff in *Ray* was a professional wrestler whose matches were filmed. *Id.* at 1141. Defendant ESPN re-telecast those films without obtaining the plaintiff's consent. *Id.* at 1141–42. The court found that the filming of the plaintiff's wrestling performances "clearly generated" an original work of authorship fixed in a tangible medium of expression. *Id.* at 1143. It thus concluded that the subject matter of the publicity-right claim fell within the subject matter of copyright because the claim was based on the distribution of copyrighted material. *Id.* In response to the plaintiff's argument that misuse of his likeness was the "true focal point" of the case, the court maintained that the publicity-right claim was preempted because "ESPN did not use [the plaintiff's] likeness or name in an advertisement without his permission to promote its commercial products." *Id.* at 1143–44 (internal quotation mark omitted).

A year later, the Eighth Circuit revisited the issue in *Dryer v. National Football League*, 814 F.3d 938 (8th Cir. 2016). There, three NFL players argued that their publicity rights were violated by use of their game footage in various NFL films, which subsequently were licensed and broadcast to the public. *Id.* at 941. They maintained that their "performances in football games" were "part of their identities rather than 'fixed' works eligible for copyright protection." *Id.* at 942. The court acknowledged that athletic performances are not copyrightable, but found "the Copyright Act specifically includes within its purview fixed

recordings of such live performances."**11**   *Id.*   Continuing, the court observed that "a right-of-publicity suit challenging the use of a copyrighted work in a *commercial advertisement* could have purposes unrelated to the aims of copyright law." *Id.* at 943 (emphasis added).  But it said that "[w]hen a right-of-publicity suit challenges the expressive, non-commercial use of a copyrighted work, . . . that suit seeks to subordinate the copyright holder's right to exploit the value of that work to the plaintiff's interest in controlling the work's dissemination."   *Id.*   Because the plaintiffs "d[id] not challenge the NFL's use of their likenesses or identities in any context other than the publication of th[e] game footage," the court held that the right-of-publicity claims fell within the subject matter of copyright.  *Id.* at 942.

A leading copyright treatise invoked by the Third and Eighth Circuits further bolsters our conclusion.  Nimmer on Copyright suggests that the right of publicity should be construed in accordance with the Restatement of Unfair Competition, "which limits liability to misappropriation for the purposes of trade."  *See* NIMMER § 1.01[B][3][b][iv] (internal quotation marks omitted).   According to the Restatement, "[t]he name, likeness, and other indicia of a person's identity are used 'for purposes of trade'" if they are used "in advertising the user's goods or services, or are placed on merchandise marketed by the user, or are used in connection with services rendered by the user."  Restatement

---

**11** This holding belies plaintiffs' assertion that their claims should not be preempted because one's likeness is not a "copyrightable contribution to photograph."  In *Dryer*, the athletic performances were likewise not copyrightable contributions, but the claims still fell within the purview of copyright because the performances were fixed in a film—a tangible medium of expression.

(Third) of Unfair Competition § 47.  Use for "purposes of trade" would not ordinarily include "the use of a person's identity in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses."  *Id.*

The "use for trade" considerations can almost perfectly distinguish between the cases finding preemption[12] and those permitting publicity-right claims to proceed.[13]  As our precedents reflect, the crucial distinction is not between

---

[12] The cases finding preemption concern the display or reproduction of copyrighted expressive works.  *See, e.g.*, *Jules Jordan*, 617 F.3d at 1150–51 (distribution of film in which plaintiff acted); *Laws*, 448 F.3d at 1136 (licensing of song in which plaintiff sang); *Fleet*, 50 Cal. App. 4th at 1914 (distribution of movie in which plaintiff acted).

[13] These cases involved an imitation of Bette Midler's voice to advertise Ford Cars, *Midler v. Ford Motor Co.*, 849 F.2d 460, 461 (9th Cir. 1988), an imitation of Tom Waits' voice to advertise Doritos, *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1096 (9th Cir. 1992), a robot resembling Vanna White to advertise televisions, *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1396 (9th Cir. 1992), robots resembling characters from Cheers used to draw customers to a bar, *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 809 (9th Cir. 1997), a photograph of a model used to advertise hair products, *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 907 (7th Cir. 2005), a photograph of surfers used to advertise and sell Abercrombie clothes, *Downing*, 265 F.3d at 999–1000, images of The Three Stooges used to sell t-shirts, *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 393 (2001), use of an announcer's voice to promote a video game, *Facenda*, 542 F.3d at 1011, and use of student-athlete likenesses to sell a video game, *Keller v. Elec. Arts Inc. (In re NCAA Student-Athlete Name & Likeness Licensing Litigation)*, 724 F.3d 1268, 1271 (9th Cir. 2013).

categories of copyrightable works, but how those copyrighted works are used.[14]

## c.  Application

As noted, Maloney and Judge do not allege that their names and likenesses were ever used in connection with the sale of any merchandise.  Nor do they contend that their likenesses were ever used in any advertising.  Instead, the copyrighted images themselves were licensed to individuals for "non-commercial art use."  Moreover, the licensees of the Maloney and Judge photos did not obtain "any right or license to use the name or likeness of any individual . . . in connection with or as an express or implied endorsement of any product or service."

Plaintiffs' publicity-right claims and the derivative UCL claim challenge "control of the artistic work itself." *Laws*, 448 F.3d at 1142.  Pursuant to *Laws*, the subject matter of the state law claims therefore falls within the subject matter of copyright.

We believe that our holding strikes the right balance by permitting athletes to control the use of their names or

---

**[14]** The McCarthy treatise echoes this conclusion. *See* MCCARTHY § 11:52 ("In some unusual cases, the use of an image of a person may be preempted by copyright law because the only use the defendant is charged with is copying or selling the image itself with no use in advertising and no use to enhance a separate product.  For example, a photo archive that merely sells reproductions of photos of athletes is not infringing the right of publicity of the pictured athletes.  Since the vast majority of athletes (both professional and amateur) do not own copyright in such photos, they have no right to control the mere reproduction and sale of their photos per se.").

likenesses on merchandise or in advertising, while permitting photographers, the visual content licensing industry, art print services, the media, and the public, to use these culturally important images for expressive purposes. Plaintiffs' position, by contrast, would give the subject of every photograph a de facto veto over the artist's rights under the Copyright Act, and destroy the *exclusivity* of rights that Congress sought to protect by enacting the Copyright Act.[15]

### 2. Step Two – The rights plaintiffs assert are equivalent to rights within the general scope of copyright.

At the second step, we determine whether the rights plaintiffs assert under state law are "equivalent to rights within the general scope of copyright as specified by section 106 of the Copyright Act." *Laws*, 448 F.3d at 1143 (quoting *Del Madera Props. v. Rhodes & Gardner*, 820 F.2d 973, 977 (9th Cir. 1987)). Section 106 affords copyright owners the "exclusive rights" to display, perform, reproduce, or distribute copies of a copyrighted work, to authorize others to do those things, and to prepare derivative works based upon the copyrighted work. 17 U.S.C. § 106. "To survive preemption, the state cause of action must protect rights which are qualitatively different from the copyright rights. The state claim must have an extra element which changes

---

[15] Notably, *Laws* expressed a similar concern when describing *Fleet*. It said that "the plaintiffs' right of publicity claim was a question of control over the distribution . . . of a movie CBS owned." 448 F.3d at 1143. Thus, "[h]ad the court [not found preemption], each actor could claim that any showing of the film violated his right to control his image and persona." *Id.* We are similarly mindful of the potential for that outcome here.

the nature of the action." *Laws*, 448 F.3d at 1143 (quoting *Del Madera*, 820 F.2d at 977).

As a threshold matter, plaintiffs waived any argument that the rights they assert are not equivalent to rights within the general scope of copyright. They did not argue the issue in their briefs, and we do not review issues raised only by amicus curiae. *Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1141 (9th Cir. 1998). Even had they made the argument, the district court nonetheless was correct to conclude that the rights plaintiffs assert are no different than the rights contained within the general scope of the Copyright Act.

The complaint asserts statutory and common law publicity-right claims, and a claim for a violation of the UCL. Plaintiffs, however, do not identify any use of their likenesses independent of the display, reproduction, and distribution of the copyrighted material in which they are depicted. We have held that under those circumstances, *none* of plaintiffs' claims is qualitatively different from a copyright claim. *See Laws*, 448 F.3d at 1144 (holding that "[t]he mere presence of an additional element ('commercial use') in section 3344 is not enough to qualitatively distinguish [a] right of publicity claim from a claim in copyright"); *see also id.* at 1143–44 ("squarely reject[ing]" the argument that a UCL claim is qualitatively different than a copyright claim under circumstances analogous to here).[16]

---

[16] The elements of a common law right-of-publicity claim are subsumed within those of a statutory claim. *See Fleet*, 50 Cal. App. 4th at 1918. Thus, *Laws* necessarily concluded that the singer's common law publicity-right claim asserted rights equivalent to copyright rights. *See Laws*, 448 F.3d at 1136 (noting singer brought both statutory and common law publicity-right claims).

**CONCLUSION**

Under the circumstances presented here, the "'subject matter' of the state law claim[s] falls within the subject matter of copyright" and "the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106." *Laws*, 448 F.3d at 1137, 1138. The federal Copyright Act therefore preempts the plaintiffs' publicity-right claims and the derivative UCL claim. In light of that holding, plaintiffs' cannot demonstrate a reasonable probability of prevailing on their challenged claims. The district court did not err in granting T3Media's special motion to strike.[17]

We **AFFIRM** the district court's order granting T3Media's special motion to strike and dismissing plaintiffs' claims without leave to amend. Appellants shall bear costs on appeal. Fed. R. App. P. 39(a)(2).

---

[17] The district court also did not abuse its discretion in deciding not to permit additional discovery. The identified topics did not bear on the issue of preemption. Moreover, given that the claims are preempted, any additional discovery would have been futile. We also do not reach T3Media's other asserted defenses in light of our holding regarding preemption.